ACCEPTED
14-13-01069-CV
FOURTEENTH COURT OF APPEALS
HOUSTON, TEXAS
4/17/2015 4:49:04 PM
CHRISTOPHER PRINE
CLERK

NO. 14-13-01069-CV

In the Fourteenth District Court of Appeals

Houston Division

FILED IN
14th COURT OF APPEALS
HOUSTON, TEXAS
4/17/2015 4:49:04 PM
CHRISTOPHER A. PRINE
Clerk

TERRANCE MANN and EVELYN MANN
*Appellants,*

v.

KENDALL HOME BUILDERS CONSTRUCTION PARTNERS I, LTD.
*Appellee.*

## MOTION FOR REHEARING

TO THE FOURTEENTH COURT OF APPEALS:

Defendant/Appellee Kendall Home Builders Construction Partners I, Ltd. moves the Court for rehearing. The Court misapplied the correct standard of review, erroneously evaluating the loan origination fee issue in paragraph 22(a) of the Plaintiff's Original Petition (a claim of StarTex error) without also referring to other more relevant paragraphs and relevant testimony in the sanctions hearing. (CR 4, DX-5, pp. 10-11; Appendix 1, 2). In evaluating the $5,000 incentive this Court analyzed paragraph 22(b)(also a claim of StarTex error) without evaluating paragraphs 30(a), 31(b), and the testimony of Mr. Hooper in the sanctions hearing. (CR 4; DX-5, pp. 10-11, Appendix 1, 3).

The trial judge correctly found these claims to be violations of Rule 13. All other claims were also groundless, frivolous, and filed in bad faith.

The Court makes two incorrect assumptions with regard to Kendall Homes' argument relating to the claims for an extra $5,000 in incentives. These two erroneous assumptions lead the Court to an erroneous conclusion. The record does contain evidence that the Manns violated Texas Rule of Civil Procedure 13 and under a correct application of the abuse of discretion standard the evidence is more than sufficient to sustain the trial judge's award of sanctions.

In the concurring opinion Chief Justice Frost contends that "every single claim" in the petition must have been groundless, that the inquiry is not "is *any* claim" groundless but "is *every* claim" groundless? This is an erroneous proposition of law as the cited authority does not support the conclusion and factually erroneous as every claim in our case was groundless.

## 1. Standard of Review.

The Court correctly cites the standard of review as abuse of discretion, with the judgment upheld if some evidence supports it. The Court correctly notes that sanctions can only be awarded for the conscious doing of a wrong, sanctions are not appropriate in cases of bad judgment, negligence, or when

based merely on surmise or speculation, and a party cannot be sanctioned for an allegation relating to the amount of damages in a pleadings. But this case involves the conscious doings of many wrongs (RR 47-48, 54, see Appendix 4), does not involve surmise or speculation, does not involve negligence or bad judgment, and is not based on an allegation that the Plaintiffs' written demand for damages is sanctionable. The judgment is supported by evidence.

With respect to the factual issues to be examined, the correct focus of time is July 30, 2010 when the Plaintiffs' Original Petition was filed, not a year earlier on July 31, 2009 when the HUD-1 was executed during the transaction. (DX-2, p. 3).

2. **Overall indicia of groundless, bad faith, and harassment.**

The scenery behind the portions of the painting under the appellate microscope is of some relevance. The trial judge reviewed evidence of the following:

A. Partial summary judgment was granted on almost all claims. (RR 54, 56).

B. The Plaintiffs filed no required pre-trial materials. (RR 30).

C. The Plaintiffs did not dismiss their claim. (RR 30).

D. The Plaintiffs did not appear for trial. (RR 30).

E.  The Plaintiffs gave no indication to Kendall Homes that they intended to abandon their claims.  (RR 30).

F.  Plaintiff's counsel failed to give Kendall Homes a valid phone number or address where he could be contacted.  (RR 63).

G.  Evelyn Mann was repeatedly listed by name as a plaintiff in both pleadings filed, and referred to as a plaintiff numerous times, yet she tried to evade sanctions by claiming she was never a plaintiff. (CR4, 38; RR DX-5, 8, 9; RR pp. 24-29, 46).

The pleading should be evaluated in the context of this backdrop.

**3. <u>The $5,000 incentives claim was groundless, in bad faith, and for harassment.</u>**

The proposed Addendum A to the contract was internally contradictory and therefore Kendall Homes never accepted it. (DX-1; RR 8, 9, 14).  Kendall Homes' intention was to provide a total of $5,000 in incentives.  (RR 8-11, 15, 18).  Since each page labeled Addendum A was prepared by the Kendall Homes salesman, in fairness to their customer Kendall Homes fixed his error by supplying $10,000: not $5,000 and not $8,000.  (RR 15).

The opinion analyzes paragraph 22 of the Plaintiffs' Original Petition which alleges claims against StarTex Title Company, not Kendall Homes, as reflected in the document and was emphasized by Mr. Hooper at the hearing. (CR 4; RR 13).  It also falsely alleges, "There is no record of the $5,000 incentive either having been credited to the Manns previously . . ."

The Plaintiffs' Original Petition refers to the $5,000 cash incentive as something that could be used for appliances or taken as cash. (CR 4, ¶16). The petition then falsely claims:

A.      The Manns were "fleeced." (¶18).

B.      The incentives were "basically fabrications." (¶23).

C.      The incentives were offered "with no intent to pay them." (¶30a).

D.      The incentives were "not applied." (¶31b).

The documentary proof conclusively disproved all these claims. (RR; DX-4). The Manns agreed – in writing – to the payments and specified the recipient of each check and the amounts. (RR; DX-3). But the Manns alleged that they should still get another $5,000 because these checks were not "the same as cash on the HUD." (RR, p. 37).

The effort to get the same $5,000 twice was groundless and in bad faith. The Manns took a written document that provides, "Buyer to have a $5,000 incentive," and after receiving the $5,000 groundlessly tried to transform the agreement into a requirement that the five checks totaling $5,000 be "the same as cash on the HUD." (RR pp. 37-38). But nothing required the $5,000 to be applied on the HUD: the Manns just made up that part of their claim. The Manns pled the $5,000 incentive was a fabrication offered with no intent

to pay it even though they knew it had been paid. They tried to keep the $5,000 paid in the form they requested (checks for appliances) and get an additional $5,000. The trial judge was well within his discretion when he decided this groundless claim was sanctionable.

The Court's opinion has several erroneous assumptions. Kendall Homes never alleged sanctions were appropriate because of a request for an *amount* of damages. So the "if it is Kendall's position" language is an erroneous assumption. Kendall Homes' position is that no contractual language ever required the $5,000 cash incentive to be "paid on the HUD." The Manns knew it was paid to their specifications and satisfaction. The Manns did not have to sign a formal release. The filing of a suit to be paid the same money twice based on a groundless construction of contractual language is a bad faith claim.

The Court writes that "Kendall appears to assume" their payment extinguished claims, but even though no unpaid actual damages exist they can support punitive damages. But Kendall Homes does not assume that. Kendall argues the Manns wanted $5,000, received $5,000, and then distorted their contractual language in a groundless way in a bad faith effort to recover the $5,000 twice plus punitive damages. There is plenty of

evidence proving Kendall Homes was correct, and under the proper application of the standard of review the judgment should be affirmed.

The Court's opinion devotes a paragraph to the non-payment of the $5,000 on page 16. But the paragraph focuses on the wrong time period (the closing instead of when suit was filed). When the Manns filed suit there was no factual basis for the claim that the $5,000 had not been paid: it was a known lie. There was no legal basis to argue it had to be "paid on the HUD": the language only said "Buyer to have $5,000 incentive." Thus it was always a bad faith and groundless allegation, especially when expressed against Kendall Homes as "offering incentives with no intent to pay them" and "$5,000 incentive not applied."

## 4. The $1273 loan origination fee claim was groundless, in bad faith, and for harassment.

The Court's opinion misapplies the standard of review and focuses on ¶ 22(a), another claim against StarTex.

The Mann's argument is based on an outrageous effort to misapply a worksheet (DX-10) and falsely claim it formed part of the sales contract. (RR 32-36). The bad faith effort is false: the worksheet is not part of the contract. (RR 40-41). Their name or lot is not even on it. No witness to events ever testified that the Manns could stack coupons and get both $5,000 in closing

costs and a $1,273 loan origination fee: the truth was they were to receive $5,000 total in closing costs including the loan origination fee. (RR 18). The worksheet itself caps the incentive at $2,200. (DX-10). Kendall Homes increased it to $5,000 but that was enough for the Manns.

This entire claim is in bad faith because it assumes – with no proof ever given – all of the following:

A.    The Manns used an approved lender,

B.    The worksheet (DX-10) was part of the contract, and

C.    The Manns could stack a $1,273 loan origination fee and a $5,000 closing cost incentive into a contractual obligation (despite the $2,200 worksheet cap).

Trying to sneak a worksheet that was never part of a contract into the contract is a classic act of bad faith, taken to support a groundless position, and the trial judge had every reason to be appalled.

Item 5 of this Court's "uncontroverted facts" is both controverted and wrong. No separate addendum existed. Each Addendum A to the contract (DX-1) says, "Seller will pay up to -0- loan discount points." Mr. Briggs testified in his eight years at Kendall Homes the worksheet (DX-10) has never been a part of the contract. (RR 40-41). In footnote 8 the opinion quotes portions of testimony where Mr. Briggs was imprecise and failed to catch the

phrases "the contract" and "the addendum" in Mr. Hooper's questions. (RR 17). But Mr. Briggs' answers over the totality of his testimony – his words, not Mr. Hooper's words in questions – are clear enough and fully support sanctions when the correct standard of review is applied. Mr. Briggs spoke of passing any lender discount to the customer (RR 17), paying the origination fee (RR 17), and then emphasized, "There's nothing that says it's additional. It says that you get a total of $5,000 in closing costs." (RR 18). When the witness was focused on the issue of whether the worksheet discussing the loan origination fee (DX-10) was part of the contract he was clear. It was not part of the contract and never has been. (RR 40-41).

5. **The Real Estate Settlement Procedures Act and Texas Insurance Code claims were groundless, in bad faith, and for harassment.**

The RESPA and Insurance Code claims are found at paragraphs 24-28 of the Plaintiffs' Original Petition (CR 4). They falsely assume, with no proof,

A. Kendall Homes required a particular title company, and

B. StarTex paid a kickback to Kendall Homes pursuant to an agreement.

Presuming this is in good faith stretches the presumption beyond its normal tensile strength. The Manns paid $732.75 to StarTex, then demanded Kendall Homes pay them 300%: $2,198.25.

But Kendall Homes has never required any buyer to use any title company. (RR p. 12). Accusing Kendall Homes of an illegal kickback was easy, but proving it was impossible since it never happened. Wrongfully and falsely accusing a company that sells to the public of a kickback, in a publicly filed document, is a sanctionable action.

**6.    The DTPA claims are groundless, in bad faith, and for harassment.**

The DTPA claims are found at ¶ 29-31. The following allegations were falsely made as to Kendall Homes:

A.    "Offering incentives with no intent to pay them,"

B.    "Forcing them to use a particular title company," and

C.    "Ignoring contractual terms that require a payment of an incentive (loan origination fee) in the preparation of the HUD-1."

All are false and disproved in testimony and documents discussed previously. All are in bad faith: they were known lies when written.

**7.    The civil conspiracy claim was groundless, in bad faith, and for harassment.**

This is ¶ 33. A conspiracy is an agreement to commit a crime: it is not an allegation to be publicly made with no support. Yet the Manns farcically claimed the homebuilder and title company worked "in concert" to "force an unsuspecting buyer to buy the home" and "finance it with an inside company."

There was never a hint of evidence that StarTex had any involvement in the contractual process or the finance decisions: these claims are too ludicrous for words.  The proof is conclusive that the Manns obtained the house they selected with $10,000 in incentives.  The Manns expressed gratitude more than a month after closing.  (DX-3).  Reading the pleading implies Kendall Homes puts buyers under duress and swindles them at will: the truth known to the Manns was they wanted to buy their home, they obtained $10,000 in incentives, they were never forced to do anything, and there is no plausible theory based in reality under which StarTex Title and Kendall Homes could possibly unite to benefit themselves by forcing the Manns to buy a home.

8.      **The fraud claim was groundless, in bad faith, and for harassment.**

The fraud allegations are in ¶ 34 and are fully rebutted above.

9.      **The breach of fiduciary duty claim did not apply to Kendall Homes.**

This is ¶ 35 of the suit and only applied to StarTex.

10.     **The concurring opinion misreads and misapplies *Nath*.**

The trial court, Court of Appeals, and Supreme Court all disapproved of Dr. Nath's abuse of Dr. Shenaq's medical history and records.  This clearly formed the primary reason for the sanctioning of Dr. Nath.  The trial court called it "an abuse of process" and "a form of extortion."  *Nath v. Texas*

*Children's Hospital*, 446 S.W.3d 355, 366 (Tex. 2014). The Supreme Court agreed that using a legal mechanism to force damaging, irrelevant information into the public domain "and thereby compel a more favorable settlement" constitutes an improper purpose. *Nath*, 366. But the misuse of health information is not a cause of action or a claim.

The Sixth Amended Petition alleged a cause of action for "intentional infliction of emotional distress and conspiracy to commit same." (See Appendix 5, a true and correct copy of Nath's Sixth Amended Petition). The Supreme Court never held the cause of action to be groundless, in bad faith, or for harassment. Yet the Court did conclude that "all of Nath's petitions are sanctionable." *Nath*, 371. There is simply no language in *Nath* that supports the idea that every claim must be groundless. Rule 13 requires "the instrument" to be groundless. Not every claim and not every cause of action: just the instrument.

If fifteen outrageously groundless claims are filed, and one legitimate cause of action also gets alleged, it cannot be the law that no sanctions are appropriate. The Texas Supreme Court and our Courts of Appeal have repeatedly made it clear that there is a remedy for abuse of the pleading

process and nothing in *Nath* limits those remedies to proof that every claim is groundless.

Even if Kendall Homes is wrong in this legal analysis, Kendall Homes is correct that applying the proper standard of review to the facts of our case results in the conclusion that all of the claims filed were false, unlikely to receive evidentiary support, based upon efforts to falsify the contract and distort its meaning, and some evidence supports the trial court's imposition of limited sanctions.

Respectfully submitted,

HERZOG & CARP


By:  /S/ Harry Herzog

**Harry Herzog**
State Bar No. 09548200
P.O. Box 218845
Houston, Texas 77218-8845
713-781-7500 Telephone
713-781-4797 Facsimile
Hherzog@hcmlegal.com

*ATTORNEY FOR KENDALL HOME BUILDERS CONSTRUCTION PARTNERS I., LTD*

# CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the above and foregoing Appellee's Motion for Rehearing has been sent to the following parties and/or counsel of record listed below via this court's electronic filing system and in the manner listed below on the 17th day of April, 2015.

*Via email: mhooper@hooperlawfirm.net*
Michael R. Hooper
The Hooper Law Firm
State Bar No. 24037849
PO Box 2134
Frisco, Texas 75035

/S/Harry Herzog
Harry Herzog

# Appendix 1

Filed 10 July 30 A2:09
Loren Jackson - District Clerk
Harris County
ED101J015888333
By: Nelson Cuero

**2010-47169 / Court: 113**

CAUSE NO. _____

| | | |
|---|---|---|
| TERRENCE MANN and EVELYN MANN, | § | IN THE DISTRICT COURT OF |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | |
| | § | HARRIS COUNTY, TEXAS |
| KENDALL HOME BUILDERS | § | |
| CONSTRUCTION PARTNERS, I. LTD and | § | |
| STARTEX TITLE COMPANY, L.L.C. | § | |
| | § | |
| Defendants. | § | _____ JUDICIAL DISTRICT |

## PLAINTIFFS' ORIGINAL PETITION

**TO THE HONORABLE JUDGE OF SAID COURT:**

NOW COMES, Terrence Mann and Evelyn Mann (collectively "Plaintiffs" or "Manns") and file this Original Petition complaining of Kendall Home Builders Construction Partners, I. LTD. ("Kendall Homes"), and Startex Title Company, L.L.C. ("Startex") and which would respectfully show the Court:

### I.
### DISCOVERY

1. Plaintiffs intend to conduct discovery under Level 2 of TEX. R. CIV. P. 190.

### II.
### PARTIES

2. Plaintiffs are individual residents of Harris County, Texas and may be served through their counsel of record.

3. Defendant Kendall Home Builders Construction Partners, I. LTD. is a Texas Limited Partnership and can be served via its Registered Agent for service of process, C/O Kenneth D. Wickens, 427 Mason Park Blvd, Katy, Texas 77450.

4. Defendant, StarTex Title Company, L.L.C. is a Texas Corporation, and can be served via its Registered Agent for service of process, Edgar D. Lester, 4700 W. Sam Houston Pkwy N #145, Houston, Texas 77041.

5. At all times relevant hereto, Defendants acted as agents for and on behalf of one another and in conspiracy with one another.

## III.
## JURISDICTION

6. This Court has subject matter jurisdiction over the controversy because the amount in controversy exceeds the minimum jurisdictional limits of this Court.

## IV.
## VENUE

7. Venue is proper in this county because all or substantially all of the events giving rise to the causes of action listed below took place in Harris County, Texas. The defendants also maintain their principal place of business in Harris County.

## V.
## ACTS OF AGENTS

8. Whenever in this Petition it is alleged that any Defendant performed any act or thing, it is meant that the respective Defendant(s) or its agents, servants, employees, or representatives performed such act or thing and at the time such act or thing was done, it was done with the full authorization or ratification of said respective Defendant(s) and was done in the normal routine course and scope of employment as respective Defendant(s) officers, agents, servants, employees, or representatives, unless otherwise specified.

## VI.
## FACTS

### A. Searching For The American Dream

9. On June 26, 2009, and after a long and exhaustive search, Terrence and Evelyn Mann found what they believed was the perfect candidate for their first-ever home. On that day the Manns, feeling all the typical first-time-buyer emotions: excitement, anxiousness, and trepidation, met with a Mr. Doug Birdsell, salesperson for Kendall Homes in the Saddle Ridge Subdivision in Humble, Texas, to go over the terms and conditions that would lead the Manns to the American Dream of home ownership.

10. It was probably fairly obvious to Mr. Birdsell, who appeared to have extensive experience selling homes, that the Manns were novice home buyers. He certainly knew that they had never purchased a home before as they informed him of the fact that this was their first purchase – spurred on by the generous tax credit offered by the Federal Government.

### B. The Bait and Switch

11. Not wanting to waste any time, Mr. Birdsell began by discussing the price of the home. Surprisingly, however, this discussion (as it was certainly not a negotiation) did not involve the buyer-salesman haggling that often leads the parties to an agreement where each believes they got the best deal. Instead, Mr. Birdsell basically presented two price options for the home. The first option allowed the Manns to purchase the home at the asking price of $127,000.00. The second option, which Mr. Birdsell labeled "the no closing cost option" provided for an increase of the sales price of the home to $132,000.00 and then Kendall Homes would pay $5000.00 towards closing costs.

12. To help drive the point home, Mr. Birdsell provided a graphical aid captioned "payments/costs" which showed the Manns the difference in the total "out of pocket" costs to buy the home based on which option they chose. There are several remarkable items contained in this, assumingly standard, form. First, in bold letters next to the caption are the words "FHA

Loan with Comparison." In the middle of the page, between the option one and two comparisons, is a box containing "Credit Score 580." At the bottom of the form is another box which promotes the fact that "Seller To Pay For Origination Fee, When Buyer Uses Approved Lender."

13. What makes these items "remarkable" is that this form seems to represent loan information or terms, and yet has no "Equal Housing Lender" disclosure or Annual Percentage Rate as required. It was also promulgated by Mr. Birdsall (as his name appears after the "Sales Representative:" field and he provided the form to the Manns) and yet there is no evidence that Mr. Birdsell is a licensed or approved FHA loan originator. If he is, there was certainly no disclosure of that fact, as is also required by the Real Estate Settlement Procedure's Act. FHA had a published minimum credit standard of 620 at the time, so it is unclear why the number "580" appears on the form. Finally, there is no further definition or clarification of what, exactly, an "Approved Lender" is; or what the maximum dollar amount or percentage for the "Origination Fee" the builder is willing to pay.

14. Additionally, in another document, labeled "Addendum A," and also provided to the Manns on the same day, Kendall Homes agreed to pay for the Owner's Policy of Title Insurance if, and only if, the Manns used the builder's "approved lender."[1] However, there is no designation in the Sales Contract or the Addendum that mentions how a closing agent will be selected save the following language:

> **"The sale under this contract shall be closed within three (3) days after the completion date as defined below in this contract and under those Sales Conditions and Closing Practices set forth on page two of this contract and by reference made a part hereof, at such time and place as Selller may designate."**

---

[1] The Plaintiffs are unable to provide any facts that would reveal the business reason for the builder paying for a title policy for the use of an unrelated and unaffiliated service and therefore relies on the Defendants to provide the explanation.

PLAINTIFF'S ORIGINAL PETITION                                                              PAGE 4

7

15. Perhaps if there were actually a paragraph captioned "Sales Conditions and Closing Practices on page two (or any page) of the Sales Contract, Plaintiff could provide clarification for the language quoted above in terms of the choice of settlement agent. Unfortunately, since no such paragraph exists anywhere in the Sales Contract, Plaintiff is unable to do so.

16. Presumably to "seal the deal," Mr. Birdsell offered the Manns an additional $5000.00 "incentive" (as it is labeled on Addendum A) to the Manns which he stated could be used for their closing costs, the purchase of appliances, or that they could just take it in cash at the closing. While an exciting proposition to the unlearned Manns, the reality of this misleading promise is that, first, it would cause the Manns to excite the six percent seller contribution cap imposed by FHA (incentive offered = $10,000 plus origination fee; incentive allowed = $7920.00); and, second, FHA (and pretty much every lender) does not allow a borrower to receive cash back at the closing table; unless it is a return of excess earnest money.

17. Up until this point, the Manns had been doing their own research to find a mortgage company. However, after Mr. Birdsell gave them this document which promises the payment of large (and impossible) incentives, the approval of a loan for a lower credit score than any other FHA lender had offered, and the quite inexplicable payment for the Owner's Policy for the use of an "Approved" but not "affiliated" lender, the Manns were sold.

C. The Choice of Settlment Providers

18. After being completely fleeced at the contract signing, the Manns audaciously informed the builder that they would like to choose the settlement agent (title company) since they had shopped and found one in particular that seemed to offer a low fee schedule. First, Mr. Birdsell informed them that they had no choice in the matter and that Kindall Homes would choose the title company (although this assertion is not entirely clear in the contract). When the

Manns provided greater detail in an email exchange with Birdsell, he pushed the question off to corporate who provided a very interesting response. The builder informed the Manns that they could not have possibly found a better deal because it was quite impossible for a title company to accurately quote fees and costs without having the builder's file in front of them.

19. This assertion was, of course, ridiculous. Title premium is regulated in Texas; so if one knows his purchase price and loan amount (which thanks to the "Cost Comparison" sheet the Manns certainly did) then a title company can provide a very accurate estimate of fees and costs. However, being ignorant of this fact, the Manns were an easy target for a builder that deals with the issue every day.

### D. Closing Day Surprises

20. About a month after they signed the Sales Contract, the house and the Manns were ready. On July 31, 2009, the Manns purchased a cashier's check for their closing costs and headed to Startex for the closing.

21. One of the duties of Startex is to prepare the HUD-1 Settlement Statement; a standardized form promulgated by HUD to show the receipt and then subsequent disbursement of all monies in the transaction. In order for Startex to prepare the HUD-1 correctly, it must look at the sales contract to find the correct purchase price, party name(s), incentives to be paid, etc. It also has to carefully examine the lender's instructions to insure those fees and costs are accurately stated on the HUD-1.

22. Even a quick examination of the HUD-1 shows Startexs performance with respect to those duties here is, to say the least, lacking. The litany of errors and failures of Startex in this regard are listed as follows:

a.  The builder never paid the mortgage origination fee as promised. While Line 801 reflects an origination fee charged to the builder, the markings on the form made by the closing agent at Startex show that amount to be added into the $5000.00 closing cost incentive which the builder also, and separately from the origination fee, agreed to pay. Coincidentally, the origination fee that the lender, Open Mortgage LLC did charge, when added to other lending costs and prepaids added up to $5000.00 exactly. Given the odd nature of such a charge (.98% origination fee), it seems clear that the builder had some influence on the lender's pricing.

b.  There is no record of the $5000.00 incentive either having been credited to the Manns previously or reflected on the HUD-1; yet Startex made no inquiry to the builder about this. The Manns inquired, to be sure, and then were subsequently told by Mr. Birdsell that they would get a check from Kendall Homes after the closing.

c.  Startex charged the Manns $25.00 for a title search fee which is not allowed in Texas by virtue of the Texas Insurance Code and the regulations promulgated by the Texas Department of Insurance.

d.  Startex charged the Manns an attorney fee for document preparation; but the Plaintiffs never requested such preparation or knew about the charge.

e.  Startex charged the Manns $275.75 in title premium. However, since the Manns were required by Kendall Homes to use Startex, RESPA forbids such a charge.

f.  Startex charged the Manns an escrow fee of $300.00; but only charged Kendall Homes $250.00 thereby giving the builder an obvious discount for the referral of settlement services which is prohibited by RESPA as well.

g. Startex charged the Manns $65.00 delivery fee but it is unclear what they delivered that gave rise to such a cost.

h. Startex charged the Manns $22.00 for a copy of deed restrictions that had already been given to the Manns by Kendall Homes over a month ago.

i. Startex charged the Manns $30.00 to record a deed that cost $20.00 to record; and $40.00 to record a Notice To Purchasers document that cost $20.00 to record. Such overcharging is specifically disallowed by the Texas Department of Insurance.

**E. The Bottom Line**

23. It seems reasonably clear how the Defendants worked together to take advantage of the Manns. The builder first sells the house by manufacturing a "good deal" with the payment of closing costs, when really the buyer is paying the closing costs through the inflated sales price of the home. Next the builder dissuades unsuspecting buyers from shopping for services by promising them credit guidelines and incentives that are basically fabrications. Finally, the builder requires the use of the settlement provider so that they can, at the very least, control the transaction and the money flow. The other players, such as Startex, take the "captured referral" as an opportunity to gouge, overcharge, and basically ignore the fiduciary duties imposed on it by the law.

**CAUSES OF ACTION**

**A. VIOLATION OF RESPA AND TEXAS INSURANCE CODE**

24. Section 9 of Real Estate Settlement Procedures Act ("RESPA") provides:

> No seller of property that will be purchased with the assistance of a federally related mortgage loan shall require directly or indirectly, as a condition to selling the property, that title insurance covering the property be purchased by the buyer from a particular title company.

25. The required use of a particular settlement agent (Startex) and then subsequent charges to the Manns of fees and costs charged by that agent, violated RESPA, Section 9(a), and Regulation X §3500.16.

26. By reason of their aforesaid conduct, and pursuant to Section 7 of RESPA, Defendants are jointly and severally liable to Plaintiffs for treble the amount of their title insurance charges paid in connection with the purchase of a residential dwelling from Kendall Homes together with costs and reasonable attorney's fees. The total damages alleged under this section (exclusive of attorney's fees) is therefore: $2198.25.

27. Defendants additionally violated RESPA Section 8 and Section 2502.051 of the Texas Insurance Code by providing a rebate and/or kickback to Seller. Specifically, in exchange for the referral by Kendall Homes to their title company, Startex discounted Kendall Homes' costs by undercharging the escrow fee and charging the title premium to the Manns which they knew was not allowable under the law. .

28. In accordance with Section 8(a) and 8(b), a seller who receives a fee, kickback or "thing of value" pursuant to any agreement or understanding that business incident to or part of a settlement service shall be referred to any person, or receives a percentage of any charge made or received for the rendering of a settlement service is liable to the person charged for the settlement service involved in the violation in an amount equal to three times the amount of the charge paid for such settlement service. The Manns paid a total of $732.75 to Startex and are therefore entitle to damages in the amount of $2198.25.

## B. VIOLATION OF TEXAS DECEPTIVE TRADE PRACTICES ACT

29. In addition, with regard to the numerous misrepresentations made by agents and employees of both Kendall Homes and Startex as described above, Section 17.46(a)(5), (9), (12), and (24), which prohibits the:

    a. representing of goods or services as having sponsorship, approval, characteristics, uses, benefits, or quantities which they do not have;

    b. advertising of goods or services with intent not to sell them as advertised;

    c. representing that an agreement confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law; and

    d. failing to disclose information concerning goods or services which was known at the time of the transaction when such failure to disclose such information was intended to induce the consumer into a transaction which the consumer would not have entered had the information been disclosed.

30. Since both Defendants, directly and indirectly represented that the contract obligated the Manns to take certain actions which are prohibited by law:

    a. Offering incentives with no intent to pay them and by simply increasing the price of the home to offset such incentives;

    b. Forcing them to use a particular title company and then making them pay title insurance premium), then both Defendants have committed a deceptive trade practice within the meaning of the law;

    c. Ignoring contractual terms that require a payment of an incentive (loan origination fee) in the preparation of the HUD-1;

    d. Charging for unallowable items (Search and Exam Fee);

e. Overcharging for items (Delivery Fee; Recording Fees)

31. The economic damages suffered by the Manns as a direct result of the defendants multiple misrepresentations are summarized as follows:

   a. $1273 not credited for the loan origination fee

   b. $5000 incentive not applied

   c. $180 in overcharges for title fees (Startex charges)

   d. $732.75 in title premium and fees (which includes the $180 above)

   Total economic damages: $7005.75.

32. Since the defendants acted knowingly and purposefully in their web of deception, the law allows the Manns to recover treble economic damages plus attorney's fees. This brings the total alleged damage amount under this cause of action to: $21,017.25 (exclusive of attorney's fees).

## C. CIVIL CONSPIRACY

33. It is clear from the facts that the Defendants work in concert to serve a common purpose. As summarized in paragraph 23 above, both Defendants work in concert to force an unsuspecting buyer to buy the home, finance it with an "inside" company and close the transaction with a "friendly" title company who will provide them discounts while at the same time gouging the consumer. As a result of their concerted and purposeful actions, each Defendant is liable jointly and severally for all damages to the plaintiffs.

## D. FRAUD

34. Defendant Kendall Homes made numerous misrepresentations to Plaintiff during the course of the sale and closing of the home as have been exhaustively outlined above. The Manns, like any reasonable people, relied on the statements as to incentives, payments, and loan

terms offered by Kendall Homes. But this reliance came at a price. The Manns did not receive all of the incentives and they overpaid for their settlement costs. The damages as a result of this reliance have been previously stated herein.

### E. BREACH OF FIDUCIARY DUTY

35. There is no question that a title company owes a fiduciary duty to the buyer as well as the seller in its dealings with both. There is absolutely no question that by ignoring contract terms, illegally charging for non-allowable items, by overcharging and then providing discounts to Kendall Homes, Startex has breached the fiduciary duty it owed to the Manns. As a result, the Manns have suffered damages in the amounts previously specified.

### DAMAGES

36. As a direct and proximate result of the occurrences made the basis of this lawsuit, Plaintiffs were caused to suffer losses and damages as specified herein, which includes reasonable attorney's fees where allowed by law or vested within the sound discretion of the court, as the case may be.

### EXEMPLARY DAMAGES

37. Pursuant to the Damages Act, Tex. Civ, Prac, & Rem, Code § 41,002(a), (b) and 41.003, to protect unwary consumers, and to discourage similar egregious violations, Plaintiffs hereby request this Court award exemplary damages to the plaintiffs in an amount to be determined by the Court.

### JURY TRIAL DEMANDED

38. Plaintiffs demand that this case be set for jury trial and tender the appropriate fee with this filing.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiffs requests that upon final hearing, that Defendants be cited to appear and answer, and, the Court enter judgment in favor of Plaintiffs as herein plead and award prejudgment interest and post judgment interest as allowed by law; and grant all other relief, in law and in equity, to which Plaintiffs may be entitled.

Respectfully submitted,

**THE HOOPER LAW FIRM**

/s/ Michael R. Hooper_____
Michael Hooper
State Bar No. 24037849
2830 Commercial Center Blvd
Suite 103
Katy, Texas 77494
(281) 395-0724
(281) 395-0720 (Facsimile)
ATTORNEY FOR PLAINTIFFS

# Appendix
# 2



**Kendall Homes** — Building Value for You

in Saddle Ridge

"PAYMENTS / COSTS"    **FHA** Loan with Comparison

Sales Representative: DOUG BIRDSELL    office: 281 446-6666    fax: 281 446-6666    mobile 936 443-5878

| Buyer(s)Name: | | Plan # : | Date : 06/26/09 |
| Address: | | Model : | |
| City: | State: | Zip: | Lot # : ___ Block # : ___ Section # : ___ |

### TOTAL MONTHLY INVESTMENT

| | | | | |
|---|---|---|---|---|
| Sales Price ............... | $127,000 | | Sales Price ............... | $132,000 |
| Down Payment (%) .......... | 3.5 % | | Down Payment (%) ......... | 3.5 % |
| Down Payment ($) ......... | - $4,450 | | Down Payment ($) ........ | - $4,650 |
| Base Loan Amt .......... | $122,550 | | Base Loan Amt .......... | $127,350 |
| UMIP (Up Front MIP) ..... | + $2,451 | Credit Score 580 | UMIP (Up Front MIP) ........ | + $1,910 |
| Total Loan Amt ......... | $125,001 | | Total Loan Amt ......... | $129,260 |
| Interest Rate (%) ......... @ | 4.5 % | | Interest Rate (%) ......... @ | 4.5 % |
| Principal & Interest............ | + $633 | | Principal & Interest............ | + $655 |
| MIP (Mortgage Ins Protection) ... | + $56 | | MIP (Mortgage Ins Protection) ...... | + $53 |
| EST Taxes (after Homestead) ... | + $251 | | EST Taxes (after Homestead) ..... | + $261 |
| Est. Home Owners Ins....... | + $65 | | Est. Home Owners Ins....... | + $65 |

(***Comparison ,with Closing Cost and PrePaids Rolled Back into Loan***)

**\*Est. Monthly Payment** $1,005 MO.    **\*Est. Monthly Payment** $1,034 MO.

### TOTAL "MOVE-IN" INVESTMENT

| | | | | |
|---|---|---|---|---|
| Down Payment ............... | $4,450 | | Down Payment ............... | $4,650 |
| Closing Costs ................... | + $2,800 | | Closing Costs ................... | + $0 |
| Prepaids .......................... | + $2,200 | | Prepaids .......................... | + $0 |

(***Comparison ,with Closing Cost and PrePaids Rolled Back into Loan***)

**\*Est. Move In Costs** $9,450    **\*Est. Move In Costs** $4,650

Seller To Pay for Loan Origination Fee , When Buyer Uses Approved Lender

\*\*Seller Paid "Pre Paids" not to exceed $2,200

\*All Calculations are Approximate (check with your lender)



DEFENDANT'S EXHIBIT 6



been admitted before; and I'd ask the court, as we did in our motion, to take judicial notice of its file.

Q. (By Mr. Hooper) The contract actually provided for an incentive if the Manns used your preferred lender. Isn't that right?

A. Yes.

MR. HERZOG: Your Honor, the sales contract is Defense Exhibit 1.

MR. HOOPER: That's not the whole contract. We've admitted the whole contract back in summary judgment. It's part of the record, so --

Q. (By Mr. Hooper) There's an addendum to it that's part of the --

You offered an additional incentive for somebody to use your preferred lender?

A. A preferred lender -- they give us -- they will extend a discount. Instead of a 1-percent origination, they'll do a half a percent; and so we pass that along to the customer.

Q. But that's not what happened here. What happened here was that there was actually an addendum that said "Manns, if you use our preferred lender, we'll pay 1 percent of the origination fee on the HUD"?

A. It says that we'll pay the origination fees.

Q. "Up to 1 percent," I believe is what it says.



Glenn Briggs

A.   Normally it's half a percent.

Q.   Okay.  We'll agree to disagree there.  The record will speak for itself.

Let's do the math.  If I and the Manns -- and I'm building a home.

For building the home, I get $10,000.  That's what this exhibit says.  Whether you meant to sign it or not, that's what this exhibit says.  I get 10,000 just for building the home.  This has nothing to do with any lending.  Correct?

A.   No.

Q.   In other words, I can go use Capital One, Bank of America, any lender I want to use and I still get the incentives in this contract.  Isn't that right?

A.   Well, it says that you get closing costs for $5,000, yes.

Q.   Right.  For building the home.

Now, in exchange for using the preferred lender, I get something additional; and that was in that addendum.  I get up to a half a percent.  I believe it says "1 percent," but whatever.

A.   There's nothing that says it's additional.  It says that you get a total of $5,000 in closing costs.

Q.   But I get that whether I build the house or not.  So why would I use your preferred lender?



MR. HERZOG: No, sir. No, sir. I didn't say it was grounds. I said it was some evidentiary proof. That's all.

THE COURT: I'll sustain the objection.

Q. (By Mr. Herzog) Please take a look at Defense Exhibit 5, the Plaintiffs' Original Petition that you have in front of you.

A. Oh, yes. Okay.

Q. Go to Page 11, Paragraph 31.

A. Okay.

Q. You've seen Defense Exhibit 2, the HUD-1 that shows the 1273 loan origination fee was paid by Kendall Homes. Correct?

A. I saw that it was on that side of the HUD, yes, I did.

Q. Do you have any evidence at all today, three years -- more than three years after the filing of this suit, that the 1273 was not credited for the loan origination fee?

A. Yes.

Q. What evidence do you have that it was not credited for the loan origination fee?

A. Thank you.

MR. HOOPER: Your Honor, I'd refer you to Exhibit A of Plaintiffs' motion for summary judgment in



the summer of 2011.

A. Exhibit A shows the complete contract, not the abbreviated version offered today by the other side; and it clearly shows that there were two incentives to be credited. One was the builder incentive. One was the incentive for the preferred lender.

What they did was: They included the second into the first when they were two separate incentives. So the basis for that claim is "You gave me 5,000 to build the house" -- that's what we already discussed with testimony earlier -- "and you gave me up to 2250 or 1 percent of the mortgage fee," is how that actually reads, "for using a preferred lender"; two different deals, two different incentives, the total being $6,273, if my math is correct.

They only gave them 5,000. That's the evidence right there from their own document.

THE COURT: Okay. Let me ask you to guide me a little bit because your Exhibit A to your motion for summary judgment is the same as their exhibit, with one exception. There's one different page.

MR. HOOPER: That's correct, Your Honor.

THE COURT: And that document says "Payments/Costs" at the top. Is that the page you're talking about?



MR. HOOPER: No. It's the financing addendum. I believe it's Page 3 there. It talks about FHA and it's got two credit scores on it and it says -- at the bottom, there's a box that says "If you use our preferred lender" --

THE COURT: Okay. Hang on.

MR. HOOPER: Actually Mr. Herzog has it.

THE COURT: All right. Bring it up.

MR. HOOPER: I'm sorry. I actually tried to go print these during the break, Judge, and wasn't able to do so.

MR. HERZOG: I'll offer the document that he refers to as Defense Exhibit 10.

THE COURT: That's the one I was talking about.

MR. HOOPER: Yes, Judge. That's exactly right. That's it.

THE COURT: Do you have other copies of this?

MR. HERZOG: That copy is for you.

THE COURT: Okay.

MR. HERZOG: I'm going to put this at your counsel table.

MR. HOOPER: Okay.

Q. (By Mr. Herzog) Is Defense Exhibit 10 the



document that you've been referring to?

A.   Yes.

Q.   Okay.

MR. HERZOG:  We offer Defense Exhibit 10.

THE COURT:  Any objection?

MR. HOOPER:  No objection.  We've already admitted it, Judge.

THE COURT:  Yes, sir.  It's admitted.

(Defendant's Exhibit No. 10 admitted)

MR. HERZOG:  I might have been multi-tasking and missed that, Your Honor.  I apologize.

Q.   (By Mr. Herzog)  Now, what evidence do you have that Defense Exhibit 10 ever became part of a contract?

A.   This was already adjudicated in the summary judgment hearing.

Q.   My question is:  What evidence do you have that Defense Exhibit 10 ever became part of a contract?

A.   Well, one, we alleged it and you didn't deny it; two, this is the evidence because it was attached to the contract as an allonge and, therefore, was incorporated in at the time the contract was created.

Q.   It's an allonge?

A.   It is attached to the contract.

Q.   By who?

A.   Well, it's your contract.  That's your client.



I don't know how they did their paperwork.

Q. You're the one that attached it, aren't you, Mr. Hooper?

A. Yes. I went into Kendall Homes and got this thing and then attached it to their own contract somehow. And that was sarcasm, for the record.

No. They attached it. How do you think I got it?

Q. Well, you can get a document without it being part of a contract, can't you?

A. Is that what you're asking me? Did I get this and put it in there?

Q. I'm asking you if you took Defense Exhibit 10, which was never part of a contract, and attached it yourself to the contract in your document that you filed with the court and that you and only you are the only person that's ever claimed that Defense Exhibit 10 is part of the contract.

A. No.

Q. Isn't that true?

A. The answer is "no."

Q. Okay. What other human being has ever said that Defense Exhibit 10 is part of this contract?

A. You have.

Q. Fair enough.



absolutely false as well. And that's also based on our required use of the title company claim as well as the fraud claim which is laid out in the amended petition.

And I think that pretty much covers the evidence for each claim.

THE COURT: All right. Thank you.

MR. HERZOG: Re-call Mr. Briggs for just a brief moment, Your Honor.

THE COURT: All right.

MR. HOOPER: Would you like me to leave these exhibits?

MR. HERZOG: Please.

GLENN BRIGGS,

having been previously duly sworn, testified as follows:

FURTHER DIRECT EXAMINATION

QUESTIONS BY MR. HERZOG:

Q. I want you to look at Defense Exhibit 1 and Defense Exhibit 10.

A. Yes, sir.

Q. Tell the judge if Defense Exhibit 10 is part of the contract which is marked as Defense Exhibit 1.

A. No, sir.

Q. Tell the judge why it's not part of the contract.

A. It's a worksheet that the salespeople use



that -- generally the first thing that any buyer wants to know is, "What are my payments going to be," and -- based on the scenario for buying the house, and that's what this is. It's basically a worksheet to try and detail what the final payment is for the customer. That's all it is.

Generally there's many of those that are created, depending on whether the -- what the buyer wants. They may want tile. They may want upgraded carpet or any number of things.

Q. You've been with Kendall Homes approximately how long?

A. Since 2004.

Q. Nine years, give or take?

A. Yes.

Q. Have you ever seen a document like Defense Exhibit 10 be part of a contract with Kendall Homes?

A. No. Never.

Q. Never?

MR. HERZOG: Pass the witness.

Oh, I'm sorry. I forgot one other thing.

Q. (By Mr. Herzog) StarTex, $50. That crept back in at the very end.

StarTex charged them $300 for something and Kendall Homes 250. You heard that?

# Appendix 3



A. We did.

Q. Look at b. "There is no record of the $5,000.00 incentive having been credited or reflected on the HUD-1." Do you see that in the petition, Exhibit 5?

A. Yes, sir.

Q. Now let's go back to Exhibits 1, 3 and 4.

Explain just briefly to Judge Landrum how the 5,000 incentive worked.

A. Well, it was to pay for the closing costs.

Q. On the third page of Exhibit 1, there's an Addendum A. Do you see that?

A. Yes, sir.

Q. It says, about the middle of the page, "Seller to pay Closing Cost." And how much is that?

A. $5,000.

Q. Underneath it, it says "Buyer to have 5,000 incentive"; and under that, it also says "3,000." Correct?

A. Correct.

Q. And this was signed by Mr. Birdsell for Kendall Homes --

A. Correct.

Q. -- and signed by Mr. Mann?

A. Correct.

Q. When you saw this document, what did you



notice?

A. I noticed that the math didn't add up.

Q. The total of 8,000 -- was it right or wrong?

A. That's hard to determine because in one place, it says 5-, the other place it says 3-. That's why I rejected it.

Q. You rejected this?

A. Yes.

Q. How much money were the Manns supposed to get as a bonus or incentive or whatever word you want to use, total?

A. $5,000.

Q. Okay. In the closing, did Kendall Homes provide the Manns with $5,000 in closing incentives?

A. Yes, sir.

Q. Take a look at the last page of Exhibit 1.
This has total incentives of $10,000. Correct?

A. Yes, sir.

Q. Did you ever sign it?

A. No, sir.

Q. Did anyone from Kendall Homes ever sign it?

A. Not to my knowledge.

Q. Tell Judge Landrum why not.

A. Because all that was allowed for the



salesperson to use was $5,000.

Q. After the closing and as reflected in Exhibit 2, if you add them all up, the incentives of $5,000 are in here. Correct?

A. Correct.

Q. Did the Manns then complain that they didn't get another $5,000 in buyer incentives?

A. Yes, they did.

Q. And did they make that complaint to you?

A. Eventually, yes.

Q. And how did you resolve the complaint?

A. With the gift cards.

Q. So in Exhibit 4, did you give them another $5,000 --

A. Yes, sir.

Q. -- for a total of -- 5,000 in closing costs and 5,000 in gift cards -- 10,000?

A. That's correct.

Q. Look at Exhibit 3, Mr. Mann's e-mail of September 3, 2009: "Glenn, thank you for your offer to clear up the confusion and misconception regarding the $5000 incentive. I spoke with my wife and we both agree what you are proposing a fair compromise, and we have put together the specifics regarding the allegation of funds."



When you read this e-mail and when you then delivered the $5,000 in the various checks in Exhibit 4, did you think the problem was solved?

A.    Yes, sir.

Q.    Okay.  Did you think you had paid 5,000 more than you owed them?

A.    Yes, sir.

Q.    Did you have a dream that a year later, July 30, 2010, suit would be filed against Kendall Homes for not paying the 5,000 in closing costs and not paying the 5,000 in gift-card incentives?

A.    No, sir.

Q.    What is your opinion of the merit of that claim?

A.    I don't think it has any merit.

Q.    When it says there's no record -- I'm back in the petition, Exhibit 5, Page 7, b -- "There is no record of the 5,000 incentive having been credited to the Manns previously," is that true or false?

A.    That's false.

Q.    Now, in 2009, how were Kendall Homes and the rest of the home builders in America doing?

A.    We were devastated.  Our whole industry was on the virtue [sic] of collapse.

Q.    In the summer of 2010 when the lawsuit was



Let's read along the last sentence of that page, would you?

Would you read that out loud, please, the last sentence of Page 6?

A. On Item 22?

Q. Yes, the last sentence.

A. "The litany of errors and failures of Startex in this regard are listed as follows."

Q. Okay. And then on Page 7, we have a, b, c, d, et cetera, that counsel just had you read.

A. Okay.

Q. Okay. I'm sorry. "The litany of errors and failures of Startex." Does that say "Kendall Builders" there, or does it say "Startex"?

A. It says "Startex."

Q. The claim seems to be driven towards StarTex, doesn't it, not Kendall Home Builders?

It says "Startex." Right?

A. It says "Startex."

Q. Okay. Let's look at these checks in this HUD now. We've got Exhibit 1 that clearly showed -- we had it admitted and this Addendum A -- that there's a 5,000-dollar buyer incentive and a 5,000-dollar closing cost incentive. Right?

You already testified to that; Exhibit 1,



Page 3.

A.    Say that again.  What was your question?

Q. .  On Exhibit 1, Page 3, you've already testified that it's supposed to be $10,000; 5,000 in closing costs, 5,000 for an incentive.  That's what that says there. Right?

A.    Well, no.  What I testified to was that this Addendum A was done incorrectly and never accepted.

Q.    Okay.  But what I asked you is:  What does this document that you just admitted into evidence say?

It says 5,000 and 5,000.  Correct?

A.    Well, on Page 3, it says 5,000 and 3,000.  In another place, it says another 5,000.  That's why it was never approved.

Q.    And these are documents that your company prepared.  Right?

A.    Correct.

Q.    Okay.  Let's go back over to Exhibit 2, the HUD-1 settlement statement.

You're familiar with these.  Right?

A.    Yes.

Q.    You said you actually wear a lot of hats.  Do you ever deal with the lending side and the builders [sic] there?

Do you ever deal with mortgage companies?



A.    No.

Q.    So you're not familiar with FHA loans and mortgage lending at all?

A.    That's not my expertise.

Q.    But are you familiar with it?

Have you seen a HUD-1 before?

A.    Yes.

Q.    Okay.  So we've got $5,000 which are designated by these check marks that you testified earlier to towards closing costs.

That's correct.  Right?

A.    Right.

Q.    But we don't have any indication of this other $5,000 that we just saw on Page 3 of that other exhibit?

A.    Again, the other $5,000 was never a part of the approved contract; but in an effort to have a happy customer and -- we did give them another $5,000 in gift cards to satisfy --

Q.    I see.

And that's reflected by these checks in Exhibit 4?

A.    Correct.

Q.    You guys went through an awful lot of work with these, having to find different vendors that you could make these payable to.  Isn't that correct?



A.   Normally it's half a percent.

Q.   Okay.  We'll agree to disagree there.  The record will speak for itself.

Let's do the math.  If I and the Manns -- and I'm building a home.

For building the home, I get $10,000.  That's what this exhibit says.  Whether you meant to sign it or not, that's what this exhibit says.  I get 10,000 just for building the home.  This has nothing to do with any lending.  Correct?

A.   No.

Q.   In other words, I can go use Capital One, Bank of America, any lender I want to use and I still get the incentives in this contract.  Isn't that right?

A.   Well, it says that you get closing costs for $5,000, yes.

Q.   Right.  For building the home.

Now, in exchange for using the preferred lender, I get something additional; and that was in that addendum.  I get up to a half a percent.  I believe it says "1 percent," but whatever.

A.   There's nothing that says it's additional.  It says that you get a total of $5,000 in closing costs.

Q.   But I get that whether I build the house or not.  So why would I use your preferred lender?



Let's go back to Defense Exhibit 5, Paragraph 31b, 5,000 incentive. Do you agree that Defense Exhibits 3 and 4 accurately and truthfully reflect the payment of $5,000 in incentives that Terrence Mann and Evelyn Mann accepted as satisfaction?

A. I never saw a release that said that they accepted it and released all claims, No. 1; and No. 2, illegal disbursements off the HUD, no, I don't accept as being the same as cash on the HUD.

Q. So you believe that in addition to paying this $5,000 in incentives, Kendall Homes should have to pay another $5,000 in incentives?

A. In the original petition, that's exactly what we alleged. Yes.

Q. ...which would be 5,000 in closing costs, 5,000 in gift cards and payment of bills and another 5,000 in cash, for a total of 15,000 in incentives. Correct?

A. We never said they had to pay that, what you have right there. I never alleged that in the petition. What I said is -- what the petition specifically says is that there was a 5,000-dollar incentive not applied. And if you look at the HUD-1 settlement statement, it certainly was not.

Q. Do you have any document anywhere where Kendall Homes promised that that 5,000 would appear on the HUD-1



and be applied on the HUD-1?

A.   Well, if Kendall Homes wants to go on the record that they routinely make deals to disburse off the HUD, then I guess I won't argue with you.

Q.   I don't --

A.   You can put that on the record.

Q.   All I want to do is get an answer to my question, which is:  Do you have anything that indicates that it has to be applied on the HUD-1 to exist?

A.   Yes, I do.  One, it's part of the contract.  Two, I've been in mortgage lending since 1996; and I am well aware of the fact that it has to be attached to the HUD and cannot be paid outside of closing.  The lenders will not allow it and neither will FHA.

MR. HERZOG:  Pass the witness.

THE COURT:  Okay.  I guess you can give rebuttal testimony.

DIRECT EXAMINATION

QUESTIONS BY MR. HOOPER:

MR. HOOPER:  Well, Your Honor, while I'm here, I'll ask the court to take -- well, we already got this one in.  I'll ask the court to also take judicial notice of -- I believe it was in our response to their motion for summary judgment.  It all was in the summer of 2011.

# Appendix 4

relevance of this?

THE COURT: Counsel, relevancy?

MR. BEAN: I want to discuss with Mr. Herzog the reasons that he filed sanctions.

THE COURT: As to the question, it's sustained.

Q. (By Mr. Bean) Mr. Herzog, can you tell the judge why you've moved for sanctions in this case?

A. Sure.

MR. HOOPER: Judge, didn't you just sustain that?

THE COURT: No. I sustained the question about in other cases, why did he not file motions.

MR. HOOPER: All right, Your Honor. Fair enough.

A. In this case -- let me just say that every defendant whines the minute they get sued and every defendant always wants the plaintiff sanctioned; and I filter 90, 95, 98 percent of those out and never even consider such a motion. In my opinion, a motion for sanctions is only warranted and was warranted in this case when you have at least two things.

First, you have to have a lawsuit that the lawyer and the party knew the moment it was filed, it was false and groundless; and, second, you have to have some

indication that they had an impure motive to file the false claim.

In this suit, there's an additional reason, because there have been continual threats in an effort to -- I hate to use the word "extort" -- but extort or blackmail Kendall Homes into paying something so that it would eliminate a claim for sanctions for what had clearly been wrongfully done. I held off filing a motion for sanctions for three years; but we had to spend thousands of dollars that Kendall Homes doesn't have to spare to comply with court orders, prepare for trial, show up for trial ready for trial, no nonsuit filed, no phone call, no fax, no e-mail, no communication of any kind for over a year that the plaintiffs aren't going to pursue their claim and then no contact by the plaintiffs with even court personnel.

And that was so upsetting to the folks at Kendall Homes that we went ahead and filed this motion.

Q. (By Mr. Bean) And your firm, Herzog & Carp, was hired to represent Kendall Homes. Correct?

A. Yes. We've represented them for more than a decade. We've had 100 percent of their litigation work for more than a decade.

Q. And I believe you have what has been marked as Defense Exhibit 6 in front of you.

sanctions were appropriate?

A. No, sir, it's not. I decided sanctions were appropriate very early in this case when I met with Mr. Briggs and with David Wickens and Ken Wickens and obtained the file materials and obtained the documented proof that showed the allegations in the petition were false.

I fought the client off. They wanted me to immediately file a motion for sanctions. I fought them off. We did a modicum of work, moved for summary judgment, obtained summary judgment.

They then wanted me to move for sanctions again. I fought them off, went to lunch with you in an effort to amicably settle the case. Without saying anything that's been ruled inadmissible, let's just say the lunch didn't work the way it was planned.

And at that point, based on your conduct at the lunch, the client went from angry and upset to enraged, which is definitely a good description of their attitude.

I then held them off for another two years and did not file a motion for sanctions, hoping that this case would amicably be resolved and time would heal all wounds; and instead, you made it worse.

Q. I see.

# Appendix Í

Filed 10 April 14 P4:45
Loren Jackson - District Clerk
Harris County
ED101J015743745
By: candice d. haynes

CASE NO. 2006-10826

| | | |
|---|---|---|
| RAHUL K. NATH, M.D., | § | IN THE DISTRICT COURT OF |
| | § | |
| *Plaintiff*, | § | |
| -vs.- | § | |
| | § | HARRIS COUNTY, T E X A S |
| BAYLOR COLLEGE | § | |
| OF MEDICINE; *ET AL.*, | § | |
| | § | |
| *Defendants*. | § | 215th JUDICIAL DISTRICT |

**PLAINTIFF'S SIXTH AMENDED PETITION**

Rahul K. Nath, M.D. ("Dr. Nath" or "Plaintiff") files his *Sixth Amended Petition* complaining

of the wrongful conduct of Baylor College of Medicine ("Baylor") and Texas Children's Hospital

("TCH") (collectively, "Defendants") as follows:

## I. DISCOVERY CONTROL PLAN

1.      Discovery is being conducted under a Rule 190 Level 3 Scheduling Order.

## II. PARTIES

2.      Dr. Nath is an individual resident of Harris County, Texas.

3.      Defendant Baylor is a corporation organized and existing under the laws of the State

of Texas that has its principal place of business in Harris County, Texas. Baylor has been served

and has filed an answer herein.

4.      Defendant TCH is a corporation organized and existing under the laws of the State

of Texas that has its principal place of business in Harris County, Texas. TCH has been served and

has filed an answer herein.

## III. JURISDICTION AND VENUE

5.      This suit is brought under the laws of the State of Texas to recover from Defendants

those damages that Plaintiff has sustained as a result of Defendants' wrongful conduct. This Court

has jurisdiction over this action because Plaintiff seeks damages in an amount within the

-1-

jurisdictional limits of the Court.

6.     This Court has venue over this action pursuant to TEX. CIV. PRAC. & REM. CODE §
15.002(a)(1) because all or a substantial part of the events or omissions giving rise to Plaintiff's
claims occurred, and because Defendants Baylor and TCH reside, in Harris County, Texas.

## IV. BACKGROUND FACTS

7.     Dr. Nath is a Board Certified plastic surgeon and peripheral nerve injury specialist
who resides in Harris County, Texas. He has gained a national reputation as one of the country's
foremost experts on surgical treatment of brachial plexus injuries, which are injuries to the nerves
of children occurring during birth. Dr. Nath previously worked with several other physicians at the
TCH Brachial Plexus Clinic (the "Clinic") in Houston, Texas, including among others, Dr. Saleh
Shenaq ("Dr. Shenaq"). TCH is affiliated with Baylor College of Medicine.

8.     In December 2003, Dr. Shenaq summoned Dr. Nath to his hospital room after he (Dr.
Shenaq) had surgery for a detached retina. Dr. Nath discussed the implications of this with Drs.
Feigin, Lee, Laurent, Grossman, but they refused to act. It appears their refusal to ensure patient
safety in favor of guarding their own interests was and is a common theme at Baylor and TCH.

9.     Given Feigin et al's failure to act, in early 2004, Dr. Nath confronted Dr. Shenaq with
the implications that, at that point, had arisen, because Dr. Shenaq was (1) operating on patients
while visually impaired (without disclosing his conditions to patients); and (2) allowing Baylor
residents to perform unsupervised surgeries - necessitated by Shenaq's blindness in one eye. In
response, Shenaq banned Dr. Nath from the Clinic and operating room.

10.     On June 2, 2004, Dr. Nath and Baylor had agreed to part ways. Nonetheless, Drs.
Grossman and Brunicardi, on behalf of Baylor, sent Dr. Nath a letter falsely alleging that there had
been complaints about Dr. Nath's billing practices, ethics, and professional conduct. Thus, in July
2004, circumstances and conscience prevailed, and thus, Dr. Nath left the Clinic to open his own

-2-

practice, unaware that a vendetta had been initiated against him. Dr. Nath soon perceived, at least, the tip of the iceberg.[1]

11. In June 2004, Baylor and TCH employee and agent, Dr. Rita Lee, Chief of the Brachial Plexus Program at TCH, falsely published on the public UBPN message board that Dr. Nath had three months earlier, without notification to TCH staff or faculty, "simply disappeared from our clinic with no forwarding address or the mere fact he had left." She, not surprisingly, also stated that children would "continue to receive state of the art care from the TCH team." Defendants' pattern of malicious and wrongful conduct against Dr. Nath apparently had the involvement and agreement of Defendants' top management and decision makers.

12. Following Dr. Lee's false posting, Dr. Nath received emails from patients and prospective patients stating they were "angry," that Dr. Lee's post was "unprofessional," "unconscionable," "very hurtful," "ungrateful," "embarrassing," "shameful," a "low blow," and even asking "are you real?" Dr. Nath was advised by readers of the post that "a lot of people are jumping to conclusions," "speculating," and that there were "many stories floating around." Dr. Nath also learned that, not unexpectedly, "newer patients are becoming apprehensive."

13. In late 2004/early 2005, Dr. Nath was precluded from performing surgery on minor

_____

[1] Dr. Brunicardi had worked directly with Dr. Nath on several patients that Dr. Brunicardi had injured surgically and had asked Dr. Nath to correct. On one occasion, Dr. Brunicardi had scheduled a patient, "CF," for hernia repair during a coincident prostate surgery by another physician. When the time came for Dr. Brunicardi to perform his part of the surgery, the hernia repair, he reportedly refused to return to the operating room and instead went to a meeting with Dr. Feigin. Reportedly, when the other physician expressed concern about the unconscious patient having specifically requested Dr. Brunicardi to perform the hernia repair and for which he consented to have Dr. Brunicardi and no one else perform the repair, Dr. Brunicardi hung up the phone. Dr. Brunicardi did not return to the operating room. Rather than allow the patient to bleed further, the other physician undertook to repair the hernia himself. During repair of the hernia, the other physician placed a suture through the patient's femoral nerve, causing a paralysis of the leg. The paralysis of the leg was discovered days after the surgery, and at that point the other physician and Dr. Brunicardi pleaded with Dr. Nath to rescue CF's leg function. Dr. Nath, in conjunction with Dr. Brunicardi, explored the wound, and Dr. Nath removed the offending stitch, relieving the patient's nerve injury. Today, the patient appears oblivious to the fact that his repair was performed by a urologist and not by Dr. Brunicardi, and unaware that Dr. Brunicardi's absence from the operating room due to Dr. Feigin's insistence on attending an administrative meeting resulted in the injury to his femoral nerve. There appears to be a falsification of medical records regarding Dr. Brunicardi's absence from surgery on the patient.

-3-

patient "IM" because of false and misleading statements and interference by Defendants. Dr. Feigin blocked the child from being transferred to TCH under Dr. Nath's care after a California physician had contacted Dr. Nath, who accepted the child in transfer for treatment of a severe brachial plexus injury. IM's breathing nerve was affected and the child was on a ventilator. However, Dr. Feigin personally prevented the child from receiving treatment by Dr. Nath at TCH.

14.     In late 2004, Dr. Nath learned that Dr. Feigin had prevented performance of triangle tilt surgeries at TCH reportedly based on a brief internet search that he performed on the topic in 2004. Many of Dr. Nath's patients thus were denied the opportunity to receive this peer-reviewed and published operation to mend their brachial plexus injuries due to Dr. Feigin's decision.

15.     In 2005, Dr. Nath was informed by "JB," the parent of a minor patient of Dr. Nath, that JB had recently learned that Dr. Shenaq had operated on his child, although JB had been deceived by Defendants into believing that the surgery was to be, and had been, performed by Dr. Nath.

16.     In 2006, Dr. Nath was approached by the medical publication "UpToDate," the premier journal for pediatricians to read about scientific developments in pediatric medicine. Dr. Nath was contacted by UpToDate to author an article on management of obstetric brachial plexus injuries due to his reputation as a leader in the field. Dr. Nath agreed and authored the article with Dr. Forrest Roth, a Baylor surgical resident. Shortly after sending in the completed article to UpToDate, Dr. Feigin took over as editor of UpToDate and quashed publication of the article. Dr. Feigin used his position as editor to inappropriately suppress Dr. Nath's co-authored article and information that would potentially be used by thousands of pediatricians to treat children with brachial plexus injuries. Tellingly, Dr. Feigin reportedly had never treated a patient with a brachial plexus injury.

17.     In 2005, patient "BR" was brought to see Dr. Nath by his parents, who previously had

-4-

been told by TCH that Dr. Nath had disappeared. BR was evaluated by Dr. Nath as needing a triangle tilt surgery due to a dislocated shoulder that had gone untreated by Defendants' physicians. BR's parents told Dr. Nath they would schedule a triangle tilt surgery with Dr. Nath but needed to go to TCH to retrieve medical records. TCH, however, subsequently gave the child and parents false information about Dr. Nath. Consequently, BR's parents never scheduled a follow-up visit for BR and Dr. Nath never was able to perform BR's necessary surgery.

18.     Also, in 2005, Dr. Nath learned from a another patient that Defendants had published and caused to be published false and misleading statements about him. These false statements were made to Dr. Nath's current and prospective patients and to professionals and others within the medical community and elsewhere. These false and misleading statements include, but were not limited to, that Dr. Nath (i) was fired from Baylor, (ii) performed unnecessary surgeries, (iii) was unqualified, (iv) lacked professional ethics and integrity, (v) left TCH without any notification, (vi) had simply disappeared from TCH without leaving any contact information, (vii) was no longer performing surgeries, and (viii) had gone into research.

19.     Consequently, in 2006, Dr. Nath then filed the instant lawsuit in an attempt to forestall any adverse effects of the falsity without any idea of the depth of professional malice, spite, professional jealousy, and sheer hatred that lay below the surface.

20.     As the instant lawsuit progressed, Dr. Nath learned of the basis of the initial fear and dishonesty that made it all but impossible for him, as a matter of circumstance and conscience, to continue his employment at Baylor:

(i)     In December 2002, Dr. Simpson, Chairman of the Ob/Gyn Department at Baylor and a Baylor employee, made false and derogatory statements concerning Dr. Nath and his medical practice to Dr. Feigin, also a Baylor employee, in an attempt to silence Dr. Nath from testifying about the medical treatment he

-5-

provided his patients suffering from obstetric brachial plexus injuries. Dr. Nath had been subpoenaed to provide testimony regarding his medical treatment of these patients, one of whom was a patient delivered by Baylor physicians under the chairmanship of Dr. Simpson. Dr. Simpson subsequently threatened Dr. Feigin and TCH with loss of referrals from his practice as well as from the Ob/Gyn Department at Baylor. Dr. Simpson also threatened Dr. Feigin with loss of referral from community pediatricians. Dr. Feigin and others republished the false statements Dr. Simpson had made concerning Dr. Nath.

(ii)     Following Dr. Simpson's statements, Defendants apparently reasoned that if they could rid themselves of Dr. Nath, their doctors could perform the surgeries Dr. Nath otherwise would have performed, and they would reap the financial benefit. Defendants thought they needed the right opportunity to force Dr. Nath out, unaware that his conscience was several steps ahead of them. In February 2004, that opportunity to exercise futility came. Defendants sought to lessen the credibility of Dr. Nath's scientific findings regarding the utility of nerve-grafting of obstetric brachial plexus patients, which Dr. Nath maintained was being superseded by simpler and cheaper surgeries that he had developed. Defendants attempted to discredit Dr. Nath's findings because the loss of revenue by their physicians that would result from fewer nerve-grafting surgeries would significantly reduce their profitability.

(iii)     While an employee of Baylor and in furtherance of Defendants' scheme to discredit Dr. Nath, Dr. Shenaq wrote one or more letters falsely complaining of Dr. Nath and having others sign the letters as their own, or exerted undue pressure and duress to have them written and/or signed. For example, Dr. Arturo

-6-

Armenta reportedly performed multiple surgeries for Dr. Shenaq when Dr. Shenaq was not in the operating room. These surgeries were performed at First Street Surgical Hospital in Houston and Cornerstone Hospital in the Rio Grande Valley. On information and belief, at that time Dr. Armenta had limited training and supervision, and yet was allowed to perform independent operations on these patients as an agent of Defendants. Dr. Armenta apparently would perform the surgeries and Dr. Shenaq would bill as if he had performed the surgeries. Dr. Armenta apparently would receive payment directly from Dr. Shenaq for his role in performing these unsupervised operations. With this financial relationship with Dr. Armenta ongoing, Dr. Shenaq forged a false document purporting to be a complaint by Dr. Armenta against Dr. Nath. Reportedly, on information and belief, Dr. Armenta refused to sign this document and it was either later forged or signed under duress.

(iv) Drs. Grossman and Brunicardi, along with Baylor and TCH, knew that Dr. Nath was concerned about and knowledgeable of Dr. Shenaq's condition and were fearful that Dr. Nath would make Dr. Shenaq's condition public. Baylor and TCH subsequently prevented Dr. Nath from having access to patients and patient charts, and continued to refer his patients to Dr. Shenaq. In an apparent attempt to further conceal Dr. Shenaq's compromised medical condition even after his death, Baylor reportedly settled a lawsuit brought by Dr. Shenaq's estate for several million dollars.

(v) On March 23, 2004, Dr. Shenaq operated on minor patient "JK" after falsely telling the child's mother that Dr. Nath had disappeared from Baylor. The child's mother had initially consulted Dr. Nath to take care of her child's brachial plexus

-7-

injury. (Ultimately, JK's mother allowed Dr. Shenaq to operate on her child). At that operation, Dr. Shenaq performed a phrenic to biceps nerve transfer, resulting in paralysis of JK's diaphragm and permanent breathing difficulties.

(vi)     In 2004, TCH scheduled "DS," the parent of a minor patient of Dr. Nath, for an appointment, without informing her that Dr. Nath would no longer be working at TCH. DS first discovered Dr. Nath was not there when Dr. Shenaq entered the exam room. At that time, Dr. Shenaq and TCH employee Lisa Thompson told DS that Dr. Nath had simply left TCH and Baylor and they did not know where he had gone. Given these representations, DS went forward with the exam with Dr. Shenaq. Thus, Dr. Shenaq and Defendants deceived DS for their own financial gain.

(vii)    Also, in 2004, TCH, through employees Lisa Davis and Lisa Thompson, on separate occasions told "SW," another parent of one of Dr. Nath's minor patients, that among other things Dr. Nath had left Baylor and no one knew where he had gone — that he had just disappeared. When, as a result of these false statements, SW agreed to be examined by Dr. Shenaq, he falsely told her that Dr. Nath had been performing unauthorized surgeries and the surgery Dr. Nath had performed on her daughter was experimental and had been disproved on adults. He also informed her that any positive effect from the surgery would not be longstanding. TCH also refused SW's request to timely transfer her records to Dr. Nath. Thus, Defendants deceived SW for their own financial gain.

(viii)   On June 14, 2004, "AD," a parent of a minor patient of Dr. Nath, had contacted Dr. Nath and stated that she would have gone to him had either TCH and Dr. Shenaq advised her that Dr. Nath was no longer at the Clinic. The litigation

-8-

revealed that Defendants' failure to inform AD that Dr. Nath was no longer at the Clinic was intended to and did deceive her for their own financial gain. The litigation further revealed that apparently Dr. Shenaq performed an inappropriate surgery on her child, leaving scarring for no justified medical reason. When the child was taken to Dr. Shenaq's office for follow-up care following surgery, Dr. Shenaq initially refused to see the child, instead sending residents to perform this duty. Reportedly, when the mother insisted that Dr. Shenaq see the child, he verbally berated the child in front of the horrified mother and ancillary office staff when the child expressed pain during Dr. Shenaq's rough handling of her immediate postoperative wound. AD wrote a letter of complaint to Defendants regarding this incident, notifying them that she was very unhappy because she would not have allowed Dr. Shenaq to operate on her child if she had known Dr. Nath was no longer working with him.

(ix) In 2004, "CB," another parent of a minor patient of Dr. Nath, understood that she had scheduled a medical examination with Dr. Nath and TCH, but instead, when she reported for the examination, she was met by Dr. Shenaq. This was the first time she had met Dr. Shenaq. As the surgery on her child had already been delayed in the past, she allowed Dr. Shenaq to perform the surgery. Dr. Shenaq's and Defendants' deception for their own financial gain again denied the patient's wishes.

(x) In 2004, Lisa Thompson told "JA," another parent of a minor patient of Dr. Nath, that she had not seen Dr. Nath in weeks, that Dr. Nath was a "terrible doctor," and that TCH was conducting inquiries regarding him.

(xi) In 2004, Lisa Thompson and Dr. Shenaq told "SD" and "BD," parents of another

-9-

minor patient of Dr. Nath, that Dr. Nath was no longer performing surgeries, but instead had retreated to solely conducting research. As a result, SD and BD allowed Dr. Shenaq to perform surgery on their child. Dr. Shenaq and Ms. Thompson again deceived another of Dr. Nath's patients for Defendants' financial gain.

(xii) In late 2004/early 2005, TCH published a false letter stating that Dr. Nath had left TCH and gone into private research.

21. In late 2009, TCH has, on information and belief, taken affirmative action to cause the Texas Medical Board (TMB) to prosecute Plaintiff. TCH has used at least one document that it received in its credentialing capacity in an intentional effort, together with Baylor, to advance what is now clearly a professional vendetta against Dr. Nath for having "blown-the-whistle" on their reckless exposure of children to a half-blind surgeon. TCH apparently notified TMB attorney, Roger Calhoun, of certain depositions in this case and caused Mr. Calhoun to be present at them. During the deposition of Brenda Devaul, Dr. Nath's former assistant, she repeated outlandish allegations against Dr. Nath which were furnished to her by TCH lead counsel in a meeting a few weeks prior to the deposition. Further, TCH's counsel, Mr. Mizell, was observed actively conferring with Mr. Calhoun who passed notes to Mizell during the deposition, and conferred at deposition breaks with both TCH's and Baylor's counsel outside the presence of Plaintiff's counsel. Following the deposition of Ms. Devaul, although there are several reasons to doubt her credibility, TMB filed a complaint against Dr. Nath, parroting almost verbatim certain of the same allegations that were furnished to and repeated by Ms. Devaul.

22. The most recent events in this litigation reveal that, the day after meeting with Dr. Nath in January 2004 regarding Shenaq's blindness, Dr. Shenaq called a meeting of the Baylor Plastic Surgery Faculty. At the meeting were several physicians, including but not limited to Dr.

-10-

Samuel Stal, Dr. Larry Hollier, Dr. Michael Klebuc, Dr. Jeffrey Friedman, and Dr. Aldona Spigel, who were present together in a conference room. Dr. Shenaq stated to those assembled that Dr. Nath was "a cancer that needed to be cut out." Later, after conspiring with Drs. Brunicardi and Grossman to create the false letter of June 2004, Shenaq stated to these doctors and others that "Nath would never work again." Dr. Shenaq further stated that he, Dr. Brunicardi, and Dr. Grossman would jointly benefit by increases in Baylor and TCH patient volume as a result of Nath being "fired." This deep hatred of Dr. Nath by these defendants was revealed in a deposition of Dr. Stal on March 3, 2010. This awful revelation by Dr. Stal corresponds to what Dr. Nath now knows was and is a vendetta against him by these Defendants as evidenced by the previously unknown and undiscoverable outrageous comments.

23.     Dr. Nath is now suffering from extreme emotional distress that is the direct result of the intentional vendetta aimed at him personally. Among other facets of Dr. Nath's emotional distress is the fact that he, a world-class surgeon, a healer of children who has never had a malpractice lawsuit filed against him, now has to absorb being characterized as a "cancer that needs to be cut out." Additionally, TCH and Baylor have caused Dr. Nath's excellent care of injured children to be considered sub-standard by the TMB. This has exacerbated the emotional injury. Dr. Nath and his wife live in fear of the daily mail delivery for new accusations "under investigation" by the TMB.[2]

24.     Dr. Nath now understands that many patients were operated on or treated by Dr. Shenaq at Baylor and TCH after Dr. Shenaq had become partially or completely blind in one eye after suffering a detached retina in November 2003, including patient JK (such patients are referred to herein as "Eyesight Affected Patients"). Although Dr. Nath subsequently learned of Dr. Shenaq's

---

[2] Ironically, in his 14 years of practice, no claims or lawsuits have ever been leveled against Dr. Nath.

emergency surgery for repair of his detached retina and thereafter had suspected that Dr. Shenaq's eyesight was severely impaired, he possessed no information at the time that could confirm the lasting impact the surgery had on Dr. Shenaq's eyesight. However, as stated above, Dr. Nath repeatedly raised the issues with individuals in leadership positions at both Baylor and TCH. Dr. Nath also had knowledge that others repeatedly raised this issue with Baylor and TCH. However, apparently no action to remedy or address this serious issue was taken by either Baylor or TCH, and Dr. Shenaq not only continued to perform surgeries on minor patients of the BP Clinic beginning in early 2004, Baylor and TCH encouraged Dr. Shenaq to do so by continuous referrals of patients to him. Even after Dr. Shenaq was fired from his position at Baylor in June 2005, both Baylor and TCH continued to refer patients to him for treatment and surgery.

## V. CAUSE OF ACTION: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS AND CONSPIRACY TO COMMIT SAME

25. Plaintiff incorporates herein by reference the allegations set forth in paragraphs 15, 45, 46, and 47 as though fully set forth therein.

26. At time of trial, Dr. Nath will prove that these defendants, acting singly or in combination, engaged in outrageous conduct as part of a small-minded, professional vendetta designed to intentionally inflict severe emotional distress upon him. As a proximate result of Defendants' intentionally wrongful conduct, Plaintiff has suffered and continues to suffer severe emotional distress for which he is entitle to damages in an amount to be determined by the trier of fact. Defendants' conduct also constitutes malice as defined in TEX. CIV. PRAC. & REM. CODE § 41.001(7) for which he is entitled to exemplary damages under § 41.003(a)(2).

## VI. DISCOVERY RULE

27. Plaintiff pleads the discovery rule as to the cause of action.

-12-

## VI. DEMAND FOR JURY TRIAL

28.    Plaintiff demands a trial by jury and has previously tendered the appropriate fee.

## VII. REQUEST FOR RELIEF

WHEREFORE, PREMISES CONSIDERED, Plaintiff respectfully prays that upon final hearing or trial, Plaintiff have and recover from Defendants (a) actual, consequential, and punitive damages as proven at trial; (b) costs of Court; (c) Pre-judgment and post-judgment interest at the highest lawful rates; and (d) all other relief, general and special, at law and in equity, to which he may show himself to be justly entitled.

Respectfully submitted,

DANIEL J. SHEA, P.C.

By: _____

DANIEL J. SHEA, Lead Counsel
State Bar No. 18163850
1928 West Bell Street
Houston, TX 77019-4814
(713) 942-7500 Telephone
(713) 942-7507 Telecopier
Djs7500@aol.com

-and-

MICHAEL A. LOGAN
State Bar No. 12497500
BRUCE M. FLOWERS
State Bar No. 07175480
KARIN M. ZANER
State Bar No. 00791183
C. JEFFREY NOVEL
State Bar No. 24037198
KANE RUSSELL COLEMAN & LOGAN, P.C.
1601 Elm St., Suite 3700
Dallas, TX 75201
(214) 777-4200
(214) 777-4299 – Facsimile

-and

-13-

CHARLA ALDOUS
State Bar No. 20545235
ALDOUS LAW FIRM
2305 Cedar Springs Rd., Suite 200
Dallas, TX, 75201
(214) 526-5595
(214) 526-5525 – Facsimile

ATTORNEYS FOR PLAINTIFF,
RAHUL K. NATH, M.D.

CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing document has been served upon the counsel of record via electronic filing notice on April __14__, 2010:

Ms. Shauna Johnson Clark
FULBRIGHT & JAWORSKI, L.L.P.
1301 McKinney, Suite 5100
Houston, TX 77010-3095
ATTORNEYS FOR DEFENDANT,
BAYLOR COLLEGE OF MEDICINE

Mr. Patrick W. Mizell
VINSON & ELKINS, L.L.P.
1001 Fannin St., Suite 2300
Houston, TX 77002-6736
ATTORNEYS FOR DEFENDANT,
TEXAS CHILDRENS HOSPITAL

_____
DANIEL J. SHEA

Unofficial Copy Office of Chris Daniel District Clerk

-14-